# In the United States Court of Federal Claims

No. 22-804
Filed: February 22, 2023

---

SARAH OTTINGER,

*Plaintiff,*

v.

THE UNITED STATES,

*Defendant.*

---

*Alexandra S. Prime* and *Jason N. Workmaster,* Trial Attorneys, Miller & Chevalier Chartered, Washington, D.C., for Plaintiff.

*Liridona Sinani*, Trial Attorney, *L. Misha Preheim*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

It is an "indisputable proposition" that death is different. *Woodson v. North Carolina*, 428 U.S. 280, 322 (1976) (Rehnquist, J. dissenting).[1] The disparity in consequence between run-of-the-mill criminal cases and federal capital litigation occasions distinct procedural and substantive protections. This case concerns the interplay of two provisions of the United States Code that cooperate to provide for the appointment and compensation of counsel for indigent defendants. The first, 18 U.S.C. § 3006A, generally provides for the appointment of counsel in federal criminal cases and sets guidelines for compensation and reimbursement of expenses. In contrast, 18 U.S.C. § 3599 expounds upon § 3006A and specifically governs the payment of fees to appointed counsel in federal *capital* cases. Plaintiff Sarah Ottinger ("Ms. Ottinger"), a Louisiana attorney, claims that fees awarded to her under § 3599 were unreasonable, running afoul of statutory intent, and constituted a breach of contract. The United States moves to dismiss.

---

[1] The derivation of the "death is different" axiom is sometimes attributed to oral argument in *Gregg v. Georgia*, 428 U.S. 253 (1976). *See The Rhetoric of Difference and the Legitimacy of Capital Punishment*, 114 Harv. L. Rev. 1599, 1599 n.1 (2002).

The United States principally argues that this Court lacks subject matter jurisdiction over Ms. Ottinger's claims. Success of this argument hinges on a finding that § 3006A and § 3599 are administered identically in terms of attorney's fees. The Court finds that its jurisdiction does not include review of decisions regarding attorney's fees under § 3599, which are part of the administration of the Criminal Justice Act. Jurisdiction for decisions regarding attorney's fees under § 3599 lies with the federal district court where the criminal case was tried or the appropriate circuit court of appeals. Therefore, individuals seeking to challenge a decision regarding attorney's fees under § 3599 cannot do so in the Court of Federal Claims. Accordingly, the United States' Motion to Dismiss, (ECF No. 6), is granted.

## I.    Background[2]

The Criminal Justice Act ("CJA") is "broad and general in its provisions and [left] its basic implementation to the courts." John S. Hastings *Criminal Justice Act of 1964* 57:4 J. Crim. L. Criminology & Police Science 426, 427 (1966). Before 1988, the CJA of 1964 "governed the appointment of counsel in all federal criminal cases and habeas litigation, regardless [of] whether the matter involved a capital or non-capital offense." *Martel v. Clair*, 565 U.S. 648, 658 (2012) (quoting § 3006A).

In 2006, Congress enacted § 3599 which clarified rights afforded to a defendant charged or convicted of crimes punishable by death. In enacting these separate laws, Congress sought to provide capital defendants with experienced counsel and reasonably necessary litigation resources. *See, e.g.,* 18 U.S.C. §§ 3599(a)(1)–(2) (capital habeas petitioners entitled to "one or more attorneys" and "investigative, expert, or other reasonably necessary services"), § 3599(c) (such counsel must have three years of experience in handling felony appeals), § 3599(d) (court may appoint a second attorney "with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation.").

Section 3599 provides enhanced rights of representation to federal capital defendants and capital habeas petitioners because of the "seriousness of the possible penalty . . . [and] the unique and complex nature of the litigation." *Martel*, 565 U.S. at 659 (quoting § 3599(d)). The Supreme Court noted that § 3599 effectuated Congress's intent that "no prisoner would be put to death without meaningful access to the 'fail-safe' of our justice system." *Herrera v. Collins*, 506 U.S. 390, 415 (1993).

Under the CJA, the appointment of court-appointed counsel is administered through individual district courts under the supervision of the judicial council of each circuit. *See* § 3006A(a). Relatedly, the CJA requires each federal district court to establish a plan "for furnishing representation for any person financially unable to obtain adequate representation" with the approval of the circuit judicial council. § 3006A(a). The CJA authorizes the Judicial Conference, a congressionally-created policymaking body for the federal courts, to "issue rules

---

[2] In considering the pending Motion to Dismiss, the Court assumes the facts alleged in Plaintiff's Complaint, (ECF No. 1), to be true. *See Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). The summary of the facts above does not constitute findings of fact but is simply a recitation of the allegations and relevant legislation.

and regulations governing the operation of plans formulated under [the CJA]." *In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 461 (3d Cir. 2015), *as amended* (June 16, 2015) (quoting 18 U.S.C. § 3006A(h)). Under this authority, the Judicial Conference promulgates a comprehensive regulatory framework for administering the CJA that is set out in its "Guide to Judiciary Policy, Volume 7, Part A (CJA Guidelines)." The CJA Guidelines afford guidance to courts for creating and maintaining a CJA plan. *See* CJA Guidelines, Vol. 7A, Ch. 2. The United States District Court for the Eastern District of Louisiana and the Judicial Council of the Fifth Circuit Court of Appeals have adopted such plans.[3]

On January 24, 2019, the Court in *United States v. George, et. al.*, Case No. 17-cr-00201 (E.D. La), appointed Ms. Ottinger to represent Mr. Chukwudi Ofomata[4] ("Mr. Ofomata"), a defendant facing capital punishment. (Compl. at ¶ 10, ECF No. 1). Ms. Ottinger is an attorney admitted to practice law in Louisiana, the District Court for the Eastern District of Louisiana, the Court of Appeals for the Fifth Circuit, and the United States Supreme Court. (*Id.* at ¶ 5). Section 3599(a)(1) dictates that when a "defendant is charged with a crime which may be punishable by death" they "shall be entitled to the appointment of one or more attorneys[]" by the Court. Ms. Ottinger was appointed "third counsel" for Mr. Ofomata and was primarily responsible for legal research and preparing motions. (Compl. at ¶ 13).

---

[3] *See* U.S. Dist. Ct. for E.D. of La., *Rev. Plan of July 18, 2018 For Furnishing Representation Pursuant to the Criminal Justice Act of 1964 (18 U.S.C. § 3006A)*, (Aug 17, 2018) (LAED CJA Plan), https://www.laed.uscourts.gov/sites/default/files/pdfs/CJA%20Plan%202018%20with%20Approval%20ELA.pdf (last visited Jan. 30, 2023); Jud. Council of the Fifth Circuit, *Plan for Representation on Appeal Under the Criminal Justice Act*, (Oct. 7, 2021) (Fifth Circuit CJA Plan), https://www.lb5.uscourts.gov/cja2/CJADocs/CircuitCJAPlan.pdf (last visited Jan. 30, 2023). The CJA Guidelines, as well as the CJA Plans, address appointment and compensation of counsel in capital proceedings. *See generally*, CJA Guidelines, Vol. 7A, §§ 620, 630; Fifth Circuit CJA Plan §§ 3, 5.B., 7; LAED CJA Plan §§ IV.B-D, X.

[4] On December 18, 2013, Mr. Ofomata, along with several co-defendants, robbed an armored vehicle as it was delivering approximately $265,000 to a Chase Bank in New Orleans. U.S. Att'y's Off., E.D. of La., *Three Sentenced in Connection with the 2013 Murder of Loomis Armored Guard Hector Trochez*, U.S. Dep't of Just. (April 21, 2022), https://www.justice.gov/usao-edla/pr/three-sentenced-connection-2013-murder-loomis-armored-guard-hector-trochez. As the vehicle prepared to make delivery, Mr. Ofomata and a co-defendant attempted to rob the armored vehicle and gunfire ensued, killing the driver. *Id.* Mr. Ofomata pled guilty to "Using, Carrying, Brandishing, and Discharging of a Firearm in Furtherance of a Crime of Violence, which resulted in death." U.S. Att'y's Off., E.D. of La., *Two New Orleans Men Sentenced in Connection with the 2013 Murder of Loomis Armored Guard Hector Trochez*, U.S. Dep't of Just. (Oct. 1, 2021), https://www.justice.gov/usao-edla/pr/two-new-orleans-men-sentenced-connection-2013-murder-loomis-armored-guard-hector (last visited Jan. 17, 2023). On September 30, 2021, Mr. Ofomata was sentenced to 480 months imprisonment. *Id.*

Given the nature of the underlying criminal case, Ms. Ottinger's attorney's fees were governed by § 3599(g)(1), which enumerates that "[c]ompensation shall be paid to attorneys appointed under this subsection at a rate of not more than $125 per hour for in-court and out-of-court time." The practicalities of its administration underlie this litigation. Notably, § 3599 does not specifically enumerate a system of review should attorneys disagree with fees they receive. Similarly, the CJA guidelines are largely silent to appellate review but provide some instruction as to filing claims. Concerning attorney compensation, the Louisiana Eastern District ("LAED") CJA Plan requires that claims for compensation under the CJA be submitted through an electronic voucher system. LAED CJA Plan, ¶ X.A. It further provides that the presiding judicial officer will not reduce any compensation claim "without affording counsel notice and the opportunity to be heard." *Id.* Further, under the Fifth Circuit CJA Plan, "all final vouchers shall be forwarded to the chief judge of the circuit or his or her designee for payment." Fifth Circuit CJA Plan, § 7 ¶ B.2.b.

Both the district court and the Court of Appeals for the Fifth Circuit approved a case budget for Mr. Ofomata's representation. (Compl. at ¶ 13). Ms. Ottinger was to be paid "$190 per hour in 2019, $195 per hour in 2020, and $197 per hour in 2021," except that beginning on May 5, 2021, she was to be paid $155 per hour because the Department of Justice deauthorized the death penalty for Mr. Ofomata. (*Id.* at ¶ 15). During her representation of Mr. Ofomata, Ms. Ottinger submitted ten interim vouchers for the district court's approval. (*Id.* at ¶ 15, 19). The district court reduced three of those. (*Id.* at ¶ 19). In January 2020, the Fifth Circuit began withholding 20% of the amounts approved for each interim voucher. (*Id.* at ¶ 18). Upon conclusion of Mr. Ofomata's representation, Ms. Ottinger submitted a final voucher requesting $19,866.02, representing the 20% of her compensation previously withheld. (*Id.* at ¶ 24). The Fifth Circuit proposed reductions to the final voucher and Ms. Ottinger sought reconsideration of the proposed reduction by submitting a written response. (*Id.* at ¶¶ 26, 27, 31). The chief judge subsequently reduced Ms. Ottinger's final withholding voucher. (*Id.* at ¶ 33). This litigation ensued.

## II.    Analysis

Here, Ms. Ottinger seeks to recover funds withheld by the Eastern District Court of Louisiana and the Fifth Circuit—$7,598.70 and $10,161.30, respectively. (Compl. at ¶ 33). Ms. Ottinger maintains that the district judge's and chief circuit judge's decisions to reduce her fees were "unreasonable and improper" under § 3599 and constitute a breach of contract by the United States. (*Id.* at ¶¶ 41, 46).

The United States moves to dismiss those claims arguing: (1) this Court lacks jurisdiction to hear violations of § 3599; and (2) Ms. Ottinger's allegations of breach of contract fail to state a claim for which relief can be granted. (Mot. to Dismiss, ECF No. 6). Ultimately agreeing with the United States, the Court addresses each argument.

*A. This Court lacks jurisdiction over Ms. Ottinger's claims.*[5]

The United States enumerates five primary reasons that the Court does not have jurisdiction over Ms. Ottinger's claims: (1) fee determinations under § 3599 are not appealable; (2) § 3599 is administrative rather than judicial in nature, and therefore a self-executing and remedial scheme for the review of fee awards; (3) a grant of jurisdiction here would undermine the legislature's intent to limit the scope of § 3599's review to the court that made the initial fee determination; (4) § 3599 decisions are left to the discretion of the district and circuit courts; and (5) Ms. Ottinger may not collaterally attack the decisions of other courts. (Def.'s Mot. at 10, 12–13.) Ms. Ottinger counters each point, primarily arguing that § 3599 is a money-mandating statute that operates separately from the CJA, thereby falling within the jurisdiction of this Court. (*See generally* Pl.'s Resp., ECF No. 7).

Whether a court has jurisdiction is a threshold matter in every case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Under RCFC 12(h)(3), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." The Tucker Act limits the Court's jurisdiction to claims (1) found on an express or implied contract with the United States; (2) seeking a refund for a payment made to the government; and (3) arising from federal constitutional, statutory, or regulatory law mandating payment of money damages by the United States government." 28 U.S.C. § 1491(a)(1). The Tucker Act confers jurisdiction "whenever [a] substantive right exists" and does not itself create an enforceable "substantive right" for money damages. *United States v. Testan*, 424 U.S. 392, 398 (1976). However, if the substantive source of law expressly provides for an alternative remedy scheme, then the Tucker Act jurisdiction is displaced in favor of the scheme explicitly provided. *United States v. Bormes*, 568 U.S. 6, 12 (2012).

The applicable CJA provision, § 3006A, contains a robust administrative fee determination scheme. It states, in relevant part:

> A separate claim for compensation and reimbursement shall be made to the district court for representation before the United States magistrate judge and the court, and to each appellate court before which the attorney provided representation to the person involved. Each claim shall be supported by a sworn written statement specifying the time expended, services rendered, and expenses incurred while the case was pending before the United States magistrate judge and the court, and the compensation and reimbursement

---

[5] The Court notes that, though it is unargued by the United States, there is no evidence to suggest that Congress intended to create a right or remedy to privately enforce provisions of the CJA and § 3599. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001). Section 3599 confers on indigent death-sentenced inmates the right to counsel in federal habeas proceedings, and the CJA sets forth the administrative regime by which the federal government provides such counsel. Under this regime, Congress has delegated to certain federal entities the responsibility for administering and monitoring the grants that pay for such counsel. *See, e.g.,* 18 U.S.C. § 3006A(i); *id.* § 3006A(h).

applied for or received in the same case from any other source. The court shall fix the compensation and reimbursement to be paid to the attorney[.]

§ 3006A(d)(5).

Comparatively, § 3599 contains no specific language regarding the review of fee determinations. As noted above, CJA Guidelines and the CJA Plans are otherwise silent as to the availability of appellate review when the circuit court denies or reduces payment of attorney fees sought under the CJA. *See generally*, § 3006A; § 3599; CJA Guidelines Vol. 7A; Fifth Circuit CJA Plan; LAED CJPA Plan; *see also Shearin v. United States*, 992 F.2d 1195, 1196 (Fed. Cir. 1993) (observing that "[t]he CJA . . . is silent as to availability of appellate review where a circuit court has denied payment of attorney fees sought under the CJA."). Because it is the nucleus of the dispute between Ms. Ottinger and the United States, the Court must analyze whether § 3599 is governed by the same administrative procedures prescribed by § 3006A.

As mentioned above, under prior versions of the CJA, § 3006A encompassed the appointment of representation in *all* federal criminal cases. Congress separately enacted § 3599 to ensure capital defendants received enhanced representation given the stakes of their litigation. *See Martel,* 565 U.S. at 658–59. In comparison to § 3006A, § 3599 requires that counsel have obtained more legal experience, *compare* §§ 3599(b)–(d) *with* § 3006A(b), and therefore provides higher rates of compensation for attorneys, *compare* § 3599(g)(1) *with* § 3006A(d), and additional funding for investigative and expert services, *compare* § 3599(f) *with* § 3006A(e). Despite these variances, the administrative effects of these distinctions are limited.

Sections 3599 and 3006A attorney's fees provisions are similar in structure and semantics. As described above § 3599(g)(1) contains similar language around the hourly rate to § 3006A. Section 3006A(d)(1) states that the attorney shall be compensated "*at a rate not exceeding* $60." (emphasis added). In comparison § 3599(g)(1) states "[c]ompensation shall be paid to attorneys appointed under this subsection *at a rate of not more than* $125 per hour for in-court and out-of-court time." (emphasis added). This unequivocal language provides that, though there is a ceiling to reimbursement, final fee determinations lie within the discretion of the trial court. Although the maximum reimbursement rates differ, sections 3599 and 3006A also contain similar expense reimbursement procedures. Like attorneys in non-capital cases under § 3006A(d)(5), an attorney in capital cases must receive permission from the chief judge of the circuit or their designee if fees and expenses "paid for investigative, expert, and other authorized under subsection (f)" exceed $7500. § 3599(g)(2). Under § 3006A, court-appointed counsel may file "a separate claim for compensation and reimbursement" in "the district court for representation before the United States magistrate judge and the court, and to each appellate court before which the attorney provided representation involved." § 3006A(d)(5). Unlike § 3006A, § 3599 does not specify how attorneys appointed in capital cases should file a claim or express dissatisfaction with the fees awarded by the reviewing court.

Neither party has cited binding authority answering whether § 3599 is generally applied in the same manner as § 3006A, as there seems to be a circuit split on the issue and silence from the Federal Circuit. To support its argument, the United States points out that the majority view is to treat § 3599 similarly to other CJA provisions when it relates to attorney's fees. The Tenth Circuit, for example, noted that "[a]lthough § 3599 is not codified in the same section as the

remainder of the CJA Courts have treated it as being part of the CJA." *Rojem v. Workm*an, 655 F. 3d 1199, 1202 n.1 (10th Cir. 2001) (citing *In re Carlyle*, 644 F.3d 694 (8th Cir. 2011)); *see e.g., Rosenfield v. Wilkens*, 468 F. Supp. 2d 806, 808 & n.1 (W.D. Va. 20006), *aff'd*, 280 F. App'x 275 (4th Cir. 2008) ("Though not codified in the same section as the remainder of the Act, we treat the provisions of § 3599 as being substantively part of the CJA."); *Gary v. Warden, Georgia Diagnostic Prison*, 686 F.3d 1261, 1269–71 (11th Cir. 2012).

Ms. Ottinger argues that these cases are "inapposite, distinguishable and unpersuasive" because § 3006A "contains a robust administrative scheme" while § 3599 "contains no administrative fee determination scheme." (Pl.'s Resp. at 5). However, the Eleventh Circuit provides a persuasive comparison of § 3599 and § 3006A which supports the United States' argument that the two provisions should receive similar jurisdictional treatment. *Gary*, 686 F.3d at 1270. In *Gary*, the Eleventh Circuit held that it lacked jurisdiction to review the partial denial of a fee voucher because the precedent set in *Rodriguez* that the appointed attorney's application for compensation under the CJA was not appealable "applies with equal force to an appointed attorney's application for compensation under § 3599(e)." *Id.* (citing *United States v. Rodriguez*, 833 F.2d 1536, 1537–38 (11th Cir. 1987) (holding that since the procedure in the district court for fee determinations is an administrative task, it is not an appealable final order). The Eleventh Circuit notes similarities of the provisions—specifically (1) the district court has the initial and primary responsibility for appointing counsel for indigent defendants and determining compensation counsel is to receive; (2) the chief judge of the circuit approves compensation exceeding statutory limits; and (3) any provision for appeal of an award of attorney proceedings is omitted. *Id.* These similarities are persuasive for the notion that, for administrative purposes, the provisions should be treated identically.

Ms. Ottinger also maintains that her case is distinguishable from those cited by the United States because they did not involve "unauthorized fee reductions by the circuit court, which are at issue in this case." (Pl.'s Resp. at 5). The Court is not persuaded by that argument; every disgruntled attorney who disagrees with a reduction in fees is essentially arguing that such a reduction was unauthorized or wrongful. Practically speaking, this distinction is immaterial.

Ms. Ottinger goes on to assert that, given the omission of language authorizing review and reduction of fees, the United States' position is blatantly contrary to the statutory language in § 3599. (*See* Pl.'s Resp. at 6). This ignores the practicalities of the CJA and § 3599. The starting point for interpreting a statute is the language of the statute itself. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). "To ascertain whether Congress had an intention on the precise question at issue, [Courts] employ the 'traditional tools of statutory construction.'" *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998). That language is not interpreted in a vacuum and the Court "must consider not only the bare meaning of each word but also the placement and purpose of the language within the statutory scheme." *Barela v. Shinseki*, 584 F.3d 1379, 1382–83 (Fed. Cir. 2009) (citations omitted). As such, a statute's meaning, regardless of whether the language is plain or not, depends on the context. *Id.* at 1383. "[S]tatutes addressing the same subject matter generally should be read 'as if they were one law.'" *Wachovia Bank, Nat'l Ass'n v. Schmidt*, 546 U.S. 303, 316 (2006) (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)). The common design of both statutes, § 3006A & § 3599, relates to the compensation of counsel in federal criminal cases, regardless of severity.

Criminal prosecution benefits from administrative procedures that streamline processes and focus efforts on paramount issues of the underlying case. The intent behind § 3599 is to provide heightened representation to defendants whose lives hang in the balance. This explains the key differences between § 3599 and § 3006A—i.e., the requirement for counsel to have more extensive legal experience and the heightened payment scale commensurate with that experience. It would be nonsensical to change, or do away with, the process by which attorneys may seek a review of those fees. A contrary reading would prove to be an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in passing the CJA and § 3599. *See Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940) ("A literal reading of [statutes] which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and with the legislative purpose."). Ms. Ottinger has pointed to no compelling precedent to support her argument that this Court should treat the two statutory schemes differently. Thus, the Court finds that, for purposes of awarding attorney's fees, § 3599 and § 3006A should be interpreted analogously and administrated alike.

Next, the Court must determine if those fees are reviewable; if so, where? The Court finds the jurisdiction for decisions regarding attorney's fees under § 3599 lies with the federal district court where the criminal case was tried or the appropriate circuit court of appeals. The United States notes that the Court of Federal Claims found that fee awards under the CJA are unreviewable by other courts that are untethered to the underlying criminal case. The Government's argument principally relies on two cases from the United States Court of Appeals for the Federal Circuit—*Shearin*, 992 F.2d 1159, and *Marcum LLP v. United States,* 753 F.3d 1380 (Fed. Cir., 2014)—both arising under § 3006A. Ms. Ottinger argues that these cases are distinguishable; she underscores that these claims are brought on different grounds and that the analysis in the decisions fails to analyze the statutory framework of § 3599. (Pl.'s Resp. at 6).

In *Shearin*, the plaintiff represented four appellants pursuant to her appointment under the CJA. 992 F.2d at 1195. Like Ms. Ottinger, Shearin submitted vouchers for her services, and the Third Circuit denied one of the vouchers. *Id.* Shearin filed suit in the Court of Federal Claims for recovery of attorney's fees alleging jurisdiction under the Tucker Act. *Id.* The Federal Circuit sustained the Court of Claims' dismissal for lack of subject matter jurisdiction stating that it agreed with the line of cases that held that fee determinations are not appealable. *Id.* at 1197. The Federal Circuit noted that "Congress placed jurisdiction for review and determination of attorney's fees under the CJA within the presiding tribunals." *Id.*[6] This holding was because a plaintiff "cannot bring yet another claim in the Court of Federal Claims in an effort to bypass the system of review and recovery established by Congress." *Id.* The Circuit emphasized that since there was no outstanding claim for money upon which a Tucker Act proceeding may lie, the Claims Court lacked jurisdiction. *Id.*

Similarly, in *Marcum*, the plaintiff was a court-appointed attorney who brought action in the Court of Federal Claims, arguing that a partial denial of his fee request under the CJA constituted an uncompensated taking in violation of the Fifth Amendment. 112 Fed. Cl. 167

---

[6] Though the Circuit's focus was on § 3006A, this distinction matters not due to this Court's analogous treatment of the two statutes for these purposes.

(2013), *aff'd*, 753 F.3d 1380 (Fed. Cir. 2014).[7] The Court of Federal Claims dismissed Marcum's claims for lack of subject matter jurisdiction, emphasizing that the Court lacked jurisdiction to hear the case because the CJA provides a statutory remedy that "preempts a more general remedy." *Marcum,* 112 Fed. Cl. at 178 (quoting *Shearin*, 992 F.2d at 1196). The prescribed remedy is that the attorney may file "a separate claim for compensation and reimbursement" in "the district court for representation before the United States magistrate judge and the court, and to each appellate court before which the attorney provided representation involved." § 3006A(d)(5). The Federal Circuit affirmed the trial court's dismissal of Marcum's claims noting that because the CJA prescribes a self-executing remedial scheme, "[granting] jurisdiction under the Tucker Act on Fifth Amendment takings grounds would undermine the Act's express intent to limit the scope of review." *Marcum*, 753 F.3d at 1383.

Although there are two instances where the Fourth and Eighth Circuits have heard appeals about attorney fee determinations, these cases are distinguishable from Ms. Ottinger's case. In *United States v. Turner*, the Eighth Circuit allowed an appeal of attorney's fees, however no jurisdictional issues were raised in this case. 584 F.2d 1389, 1389 (8th Cir. 1978). In contrast, here the United States is directly contesting jurisdiction. In *United States v. Ketchum,* the Fourth Circuit stated that on remand the district court should reimburse a court-appointed attorney's out-of-pocket expenses after the district court refused compensation. 430 F.2d 901, 904 (4th Cir. 1969). Comparatively, Ms. Ottinger's fees were reduced rather than denied altogether. Additionally, in *Ketchum*, the appeal concerned the substance of the criminal case, rather than the issue of attorney's fees. Most importantly, in both cases, to whatever limited extent the facts may be similar to Ms. Ottinger's claim, the review stayed within the hierarchy of the appointing and appropriate reviewing court.

The Court has also considered the Supreme Court's decision in *Ayestas v. Davis*, 138 S. Ct. 1080, 1083 (2018), as it explores the benefits of appellate review relevant to subsections of § 3599 not addressed here. In that case, the Supreme Court held that a denial of a petitioner's funding request under § 3599(f), the portion of the statute that authorizes funding for investigative and expert services, was a judicial decision subject to appellate review. In *Ayestas*, the petitioner filed an ex parte motion, asking the district court for funding to develop his claim that both his trial and state habeas counsel were ineffective. *Id.* The Court highlighted that the language of subsection (f) required the district court to resolve a legal question, whether the funding is "reasonably necessary" for effective representation, which requires an evaluation of the petitioners' prospects for obtaining habeas relief. *Id.* Ms. Ottinger's case is distinguishable because it concerns attorney's fees, arising under a separate subsection, § 3599(g)(1). *Id*. at 1084. The language of subsection (g) states that "[c]ompensation shall be paid to attorneys appointed under this subsection at a rate of not more than $125 per hour for in-court and out-of-court time." § 3599(g)(1). The district courts' evaluation of attorney vouchers does not require them to resolve a legal question but instead provides judges with administrative discretion to set attorney's fees.

---

[7] The Court acknowledges that Ms. Ottinger's claims are not tethered to the Fifth Amendment, but the Circuit's logic applies.

The logic of *Marcum* and *Shearin* is sound and practical. While both cases demonstrate that this Court lacks jurisdiction over fee determinations arising under the CJA, the Federal Circuit's holdings and reasoning in *Shearin* and *Marcum* apply with equal force to Ms. Ottinger's claims despite their framing differences. Practically speaking, this application is the only way these statutes make sense. The tribunals trying the underlying case have first-hand knowledge about the facts of the case and can readily assess the appointed attorney's work, a basis which this Court lacks. As the United States notes, the district judge in the Eastern District of Louisiana appointed Ms. Ottinger, set the scope of her representation, fixed the hourly rates at which she would be compensated, and approved a case budget for Ms. Ottinger's service. (Def.'s Mot. at 13). Presumably, the same judge presided over the criminal proceeding and was well versed in the facts and history of the case to be able to determine whether Ms. Ottinger's fees were reasonable and within her scope of representation. (*Id.* (citing Compl. ¶ 23 (alleging that the district judge determined Ms. Ottinger "spent excessive time and effort on [] failed motion[s]"))). When weighed against the front-row seat occupied by the appointing district court, this Court's exposure is attenuated from that process and thus ill-equipped for examination.

As another real and practical concern, requesting the Court of Federal Claims to reanalyze findings made by another judge necessarily requires the review of decisions by another tribunal. As stated above, Ms. Ottinger seeks to recover $7,598.70 withheld by the district court and the $10,161.30 withheld by the circuit court. She alleges that "it was unreasonable and improper for the district court and the circuit court to reduce [her] attorney fees." (Compl. ¶¶ 39–40). The Court of Federal Claims lacks jurisdiction to review the decisions of federal district courts and courts of appeals, and thus cannot entertain claims that "require[] the court to 'scrutinize the actions' of another tribunal."[8] *Allustiarte v. United States*, 256 F.3d 1349, 1352 (Fed. Cir. 2001); *see also Joshua v. United States*, 17 F.3d 378, 380 (Fed. Cir. 1994) ("[T]he Court of Federal Claims does not have jurisdiction to review the decisions of district courts or the clerks of district courts relating to proceedings before those courts.").

Finally, the Government poses an overreaching argument around this Court's ability to review administrative "decisions."[9] The Government implies that this Court can never review

---

[8] Not all decisions made by judges are judicial in nature. *See Ayestas*, 138 S. Ct. at 1090 (2018) (noting "the need for federal judges to make many administrative decisions is obvious. The Federal Judiciary, while tiny in comparison to the Executive Branch, is nevertheless a large and complex institution, with an annual budget exceeding $7 billion and more than 32,000 employees.") (citing Administrative Office of the U.S. Courts, The Judiciary FY 2018 Congressional Budget Summary Revised 9–10 (June 2017)). Whether a judicial officer's decision is "judicial in nature" or administrative determines the scope of review, if any, by another court.

[9] "Decision" is a term that could embrace countless acts by district courts. They make decisions pertaining to "personnel, facilities, equipment, supplies, budgeting, accounting, security, rulemaking and public relations." *In re Application for Exemption from Elec. Pub. Access Fees by Jennifer Gollan & Shane Shifflett,* 728 F.3d 1033, 1037 (C.A.9 2013) (internal citations omitted). They "appoint clerks and bailiffs, order supplies, write and promulgate rules, and so on." *Id.* (internal citations omitted).

administrative decisions of other courts. (Def.'s Mot. at 13). The Court declines to support this broad implication. Because Ms. Ottinger's claims are unreviewable on other grounds, it need not analyze this argument.

In sum, Ms. Ottinger has failed to demonstrate why § 3599 should not be administered akin to the procedures enunciated within the CJA. Thus, payment of attorney's fees, including those obligated under § 3599, are administered in accordance with CJA guidelines. The Court finds that it lacks subject matter jurisdiction over the instant case because the CJA explicitly provides a process for administrative review that preempts a more general remedy. *See Shearin,* 992 F.2d at 1196–97. Because the substantive source of law expressly provides for an alternative remedy scheme, this Court defers to that scheme.

      *B.  Ms. Ottinger fails to state a claim for which relief can be granted.*

Ms. Ottinger further claims she is entitled to all fees she requested based on an implied contract with the United States. (Compl. at ¶ 43–47). The United States argues that Ms. Ottinger fails to state a claim upon which relief may be granted. Specifically, the United States argues that this Court has found that court-appointed representations do not qualify as a contract and that the appointing courts are merely exercising their statutory role and not contracting with attorneys. (Def.'s Mot. at 15).

Rule 12(b)(6) requires dismissal when a complaint fails to state a "claim for relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). Under RCFC 12(b)(6) a claim may be dismissed, "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). The Court "must accept as true all the factual allegations in the complaint and must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil,* 241 F.3d at 1378 (citations omitted). However, the Court need not "accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "A claim is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id*. (quoting *Iqbal*, 556 U.S. at 662).

The United States largely relies on the language from the Claims Court decision in *Shearin*. (Def.'s Mot. at 12 (citing *Shearin v. United States,* 26 Cl. Ct. 678, 679 (1992))). There, the Claims Court held that, under the CJA, "as a matter of law, no contract [can be] formed." *Shearin*, 26 Cl. Ct. at 679. This is because "[b]y appointing counsel [pursuant to the CJA], the district court or court of appeals is not contracting for services. It is merely exercising its role under the statute." *Id.* Those circumstances "therefore could not lead to the formation of a contract." *Id.* The Federal Circuit affirmed this holding and agreed that the complaint was properly dismissed for "there was no outstanding claim for money upon which a Tucker Act proceeding may lie[.]" *Shearin*, 992 F.2d at 1197. Ms. Ottinger counters that this Court should treat § 3599 differently than § 3006A in determining whether she has a contract with the district court. (Pl.'s Resp. at 7). The Court reiterates that the provisions apply equally here. However, Ms. Ottinger also notes that since CJA Guidelines equate the approval of a budget to private legal retainer agreements, the Court should treat the approved budget as a contract. (*Id.*)

This Court's "jurisdiction extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." *Hercules Inc. v. United States*, 516 U.S. 417, 423 (1996); *see also* 28 U.S.C. § 1491(a)(1). The two types of implied contracts differ significantly. *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998). Specifically:

> An agreement implied in fact is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." By contrast, an agreement implied in law is a "fiction of law" where "a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress."

*Hercules Inc.*, 516 U.S. at 424 (citations omitted) (quoting *Balt. & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923)). Implied in fact contracts have the same requirements as express, valid contracts. *See Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997) ("[T]he general requirements of a binding contract with the United States are identical for both express and implied contracts."). To prove the existence of a contract, a plaintiff must establish four elements: "(1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States." *7800 Ricchi, LLC v. United States*, 152 Fed. Cl. 331, 336 (2021), aff'd, 2021 WL 5315425 (Fed. Cir. Nov. 16, 2021). "A failure of any of these requirements precludes the existence of a valid contract." *McLeod Grp. LLC v. United States*, 840 Fed. Appx. 525, 527 (Fed. Cir. 2020).

Ms. Ottinger claims that the United States effectuated a breach of contract because it failed to pay "reasonable fees . . . pursuant to § 3599." (Compl. ¶ 7). The central failure of this claim is that Ms. Ottinger has not pled the elements of a contract. Namely, on the face of her pleading, she has not shown that the trial judge had the authority to bind the United States or that consideration was exchanged. (*See generally* Compl.). This is a fatal omission of Ms. Ottinger's breach claim. Even if Ms. Ottinger had adequately pled basic contractual elements, the United States is correct in citing *Shearin*. There, the Court held that the attorney and the district court were not in a contractual relationship because by "appointing counsel, the district court or court of appeals is not contracting for services[,]" but is instead merely exercising its role required by the CJA. 26 Cl. Ct. at 678.

Ms. Ottinger also asks the Court to rely on contradictory arguments. As to her jurisdictional counterargument, Ms. Ottinger urges this Court to not follow precedent treating § 3599 as part of the CJA. (Pl.'s Resp. at 6). However, in the same breath for her breach claim, Ms. Ottinger relies on the CJA guidelines to demonstrate that she is in a contract with the District Court and the Fifth Circuit. (*Id.* at 7–8). The CJA guidelines state that the approved budget "serve[s] purposes comparable to those of private retainer agreements[.]" 7A *Guide to Judiciary Policy, Defender Services*, Ch.6. § 640.20(a), https://www.uscourts.gov/rules-policies/judiciary-policies/cja-guidelines/chapter-6-ss-640-case-budgeting (last visited January 31, 2023). This is not persuasive; the plain language of the guidelines merely establish that a budget is analogous to a contract. Comparable does not mean exact.

Because Ms. Ottinger has not pled the elements of a contract, she fails to state a claim upon which this Court could grant relief. Further, by appointing Ms. Ottinger pursuant to § 3599, the district court and the Fifth Circuit did not contract for Ms. Ottinger's services. Rather, as in *Shearin*, they merely exercised their role under the statute. These circumstances do not form a contract.

### III.    Conclusion

Ms. Ottinger posits the existence of a reality where courts appoint litigation counsel to indigent defendants and—because the case involves an allegation of a death eligible crime—trial and appellate courts mechanistically approve requested fees and expenses. In this world, when those judges fail to acquiesce to requested sums, they are removed from the equation. Instead of those judges—who are privy to the actual litigation and fulfillment of counsel's Sixth Amendment duties—resolving concerns regarding diminished fees, counsel must file suit in the Court of Federal Claims. In such a scenario, an attorney for the Department of Justice evaluates and defends against counsel's claim despite having no knowledge of the underlying case; the district and circuit judges (and perhaps their staff) respond to interrogatories, are deposed, and appear at trial as witnesses. Then, the Court of Federal Claims evaluates testimony and renders judgment. Assuming plaintiff is somewhat effective in regaining previously reduced fees, the Court of Federal Claims would then adjudicate counsel's additional request for their private attorney's services. Finally, the disappointed party before the Court of Federal Claims can appeal its claims of error to the Federal Circuit, another court with no firsthand knowledge that is widely separated by experience and time from the original justification for the reduction in fees. Yet the existence of this alternate world is not compelled by statute or reason simply because "death is different." While the underlying litigation is uncontrovertibly more significant than non-capital litigation, matters of attorney compensation are not.

Ms. Ottinger's claims are improper before this Court because the CJA contains its own statutory remedy and she cannot establish the existence of a contract under § 3599. Therefore, the Court holds that Ms. Ottinger cannot establish jurisdiction or maintain these allegations before the Court of Federal Claims. The Complaint must be **DISMISSED** in its entirety. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**



s/   David A. Tapp
DAVID A. TAPP, Judge